UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

FRANK CHRISTENSEN,

                               Plaintiff,

          -v-

MARK NAUMAN, et al.,

                            Defendants.

------------------------------------------------------------------------X

14 Civ. 5367 (PAE)

<u>OPINION & ORDER</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/29/14

PAUL A. ENGELMAYER, District Judge:

       In this diversity action, Frank Christensen ("Christensen") brings claims against KCCI,

Ltd. ("KCCI"), and two of its officers, Mark Nauman ("Nauman") and William Gollner

("Gollner"). As pled, Christensen's claims involve both direct and derivative claims, the latter

brought in Christensen's capacity as a KCCI shareholder. Christensen's claims are to the effect

that he was deprived of money, value, or procedural rights to which he was entitled as an owner

and/or shareholder of KCCI.

       Defendants now move to compel arbitration under the auspices of the Financial Industry

Regulatory Authority ("FINRA"), pursuant to a binding arbitration provision in Christensen's

Form U-4 Uniform Application for Securities Industry Registration or Transfer ("Form U-4").

For the following reasons, the Court grants the motion to compel arbitration, and stays this action

pending the outcome of that arbitration.

I.    **Background**[1]

A.    **The Parties**

KCCI is a New York corporation with its principal place of business in Jersey City, New Jersey.  *Id*. ¶ 2.  Christensen, a Florida citizen, is KCCI's founder.  Compl. ¶¶ 1, 9.  Nauman, a New Jersey citizen, is KCCI's president, treasurer, and chief executive officer.  *Id*. ¶¶ 3, 20. Gollner, a New York citizen, is KCCI's vice president.  *Id*. ¶¶ 4, 21.  Christensen, Nauman, and Gollner are the three directors of KCCI.  *Id.* ¶ 22.

B.    **Factual Background**

In 1976, Christensen founded F.A. Christensen, Inc., a stock brokerage firm, which in 2006 was renamed KCCI and which the Court refers to as such.  *Id*. ¶¶ 9, 11, 24.  In 1991, Christensen hired Nauman as a clerk.  *Id*. ¶ 12.  In October 1996, Nauman bought 10 shares, equating to a 50% ownership interest, in KCCI, and he and Christensen began serving as KCCI's only directors.  *Id*. ¶¶ 14, 15.  During that year, Nauman became KCCI's president, treasurer, and CEO, and Christensen retired to Arizona.  *Id*. ¶¶ 15, 20.

After Christensen retired from KCCI in 1996, he began leasing his seat on the New York Stock Exchange ("NYSE") to KCCI, which, to trade securities on the NYSE, was required to own or lease a seat.  *Id*. ¶ 16.  Between 1996 and March 2006, Christensen leased that seat to KCCI for between about $200,000 and $350,000 per year.  *Id*. ¶ 17.  During these years,

---

[1] The facts that form the basis of this Opinion are drawn from the Complaint, Dkt. 1 ("Compl."); the declaration of Mark A. Nauman in support of defendants' motion to dismiss the complaint and to compel arbitration, Dkt. 10 ("Nauman Decl."); the reply declaration of Mark A. Nauman in support of this motion, Dkt. 18 ("Nauman Rep. Decl."); and exhibits that Christensen submitted with his response to this motion, which consist of (a) a January 24, 2007 Securities and Exchange Commission ("SEC") order regarding proposed rule changes to the NASD Arbitration Rules for Customer and Industry Disputes; and (b) an August 28, 2014 letter to the Court regarding Christensen's motion to extend his time to respond to defendants' motion.

Christensen continued to provide advice to Nauman and other colleagues, but he did not request or receive any other compensation or distributions from the company. *Id.* ¶¶ 18, 19.

In 2001, Gollner became KCCI's vice president. *Id.* ¶ 21. In 2004, Nauman asked Christensen to sell a portion of his ownership interest in the company to Gollner, *id.* ¶ 22; on December 14, 2004, Christensen sold Gollner a 10% ownership interest in KCCI for $140,000 through a stock purchase agreement. *Id.* In 2004 or early 2005, Christensen, Nauman, and Gollner began serving as the company's three directors. *Id.*

During that same year, the NYSE demutualized. *Id.* ¶ 25. As a result, after March 8, 2006, a securities trader no longer needed to own or lease a seat to trade on the NYSE. *Id.* ¶ 26. KCCI therefore stopped paying Christensen for the use of his seat. *Id.*

In 2008, KCCI gave Christensen a $40,000 dividend and a $15,000 commission. *Id.* ¶ 28. Christensen did not receive notice of a directors' meeting regarding these distributions, *id.*, and that $55,000 distribution was the last payment Christensen received from KCCI. *Id.* ¶ 29. Christensen was untroubled by the lack of distributions during 2008 and 2009, which he attributed to the contemporaneous recession. *Id.* ¶ 30. In 2014, however, Christensen discovered that, during that period, Nauman, Gollner, and Marshall Maddox ("Maddox"), KCCI's chief financial officer, had all received million-dollar payments from KCCI. *Id.* ¶¶ 23, 31, 32. KCCI's board did not approve these payments; Christensen, a director, was never notified of a directors' meeting. *Id.* ¶ 33.

In 2010 and 2011, Christensen attempted to sell his remaining 40% ownership interest in KCCI to Tom Caldwell ("Caldwell"), a Canadian businessman. *Id.* ¶¶ 35, 36. In May 2011, Christensen met with Nauman and Caldwell in KCCI's offices to discuss selling Christensen's remaining ownership interest to Caldwell. *Id.* ¶ 37. Caldwell offered to buy Christensen's stake

for $500,000, *id.*; Christensen expressed interest in accepting that offer. *Id.* ¶ 38. But, about a week later, instead of permitting Christensen to sell his stake in KCCI to Caldwell, Nauman proposed selling a 25% ownership interest of KCCI from the owners collectively to Caldwell for $500,000. *Id.* ¶ 39. Caldwell rejected Nauman's offer. *Id.* ¶ 40.

On August 1, 2011, KCCI's membership with the NYSE was effectively terminated, but KCCI maintained its FINRA membership. *Id.* ¶ 41. In 2011, KCCI's offices moved from New York City to Jersey City, New Jersey. *Id.*

In April 2013, in connection with estate planning, Christensen emailed Nauman to request KCCI's tax returns for the previous three years and its financial and operation status ("FOS") reports for the prior six quarters. *Id.* ¶ 42. Nauman provided Christensen with only four FOS reports and audited annual reports for 2011 and 2012. *Id.* ¶ 43. He did not provide Christensen with any tax returns or with the FOS report for the first quarter of 2013. *Id.*

On September 13, 2013, Nauman sent Christensen an e-mail, which attached March 29, 2013 and August 28, 2013 documents titled "Written Action of Directors in Lieu of Meeting" that purported to authorize the issuance of eight additional shares of KCCI stock to Nauman. *Id.* ¶ 45. Christensen had not previously heard of the issuance of additional KCCI stock to Nauman. *Id.* ¶ 47. The two attached documents were signed by Nauman and Gollner. *Id.* ¶ 46. The line provided in each document for Christensen's signature was left blank. *Id.*

In December 2013, Nauman and Gollner sold KCCI to Lampert Capital Markets, Inc. ("Lampert"). *Id.* ¶ 48. Christensen did not approve of the sale, and was not notified of it at the time, nor was a meeting or vote of KCCI's directors ever held. *Id.* ¶¶ 48, 51. Nauman and Gollner, with Maddox's help, negotiated the sale with representatives of Lampert. *Id.* ¶ 50.

Christensen did not receive any proceeds from the sale despite his 40% ownership stake in KCCI. *Id.* ¶ 48.

On December 31, 2013, KCCI terminated its FINRA registration. *Id.* ¶ 55. In December 2013 or January 2014, Nauman and Gollner registered with FINRA as employees of Lampert. *Id.* In 2014, Christensen learned of the sale of KCCI to Lampert via public documents provided to him by his counsel. *Id.* ¶ 54. Lampert has been identified in SEC filings as "the successor to KCCI, Ltd." *Id.* ¶ 55.

### C.   Christensen's Form U-4

On June 30, 2009, Christensen executed a Form U-4, which generally requires the arbitration of disputes between Christensen and the defendants under FINRA.[2]  Nauman Rep. Decl. Ex. A.  Specifically, Christensen agreed

> to arbitrate any dispute, claim or controversy that may arise between me and [KCCI] . . . or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the SROs indicated in Section 4 (SRO REGISTRATION) as may be amended from time to time and that any arbitration award rendered against me may be entered as a judgment in any court of competent jurisdiction.

*Id.* at 6.

### D.   Procedural History

On July 16, 2014, Christensen filed the Complaint, which originally also named Lampert as a defendant.  Dkt. 1.  The Complaint contained 12 causes of action and sought broad-ranging relief, including at least $3 million in compensatory damages for Christensen, an accounting as to KCCI, repayment of money to KCCI by Nauman and Gollner, an invalidation of the issuance

---

[2] In opposing the motion to compel arbitration, Christensen initially denied any "recollection of executing a Form U-4 in 2009 or at any other time" or awareness "of any reason why a Form U-4 would have been submitted."  Pl. Br. 2 n.2.  However, during argument, Christensen's counsel abandoned this claim and acknowledged that Christensen had signed the June 30, 2009 Form U-4.  Tr. 31.

of shares in KCCI to Nauman, and a declaration that Christensen is a 40% owner of KCCI

entitled to 40% of the proceeds of any sale of KCCI.

On August 7, 2014, the defendants and Lampert filed a motion to dismiss the Complaint

in favor of arbitration, which they moved to compel.  Dkt. 8, 9 ("Def. Br.").  On September 5,

2014, Christensen filed a brief in opposition, Dkt. 15 ("Pl. Br."), and on September 9, 2014,

voluntarily dismissed, without prejudice, the claims against Lampert.  Dkt. 16.  On September

10, 2014, the remaining defendants filed a reply.  Dkt. 17 ("Def. Reply Br.").

On November 14, 2014, the Court heard argument.  *See* Transcript ("Tr.").  During

argument, Christensen's counsel explained that, although the Complaint pleads both direct and

derivative claims, he is unaware of the facts surrounding, *inter alia*, the sale of KCCI.  Tr. 28,

34.  Counsel explained that Christensen's Complaint pleads derivative and direct claims as to the

same underlying facts to insure that all potentially viable claims were pled.  *Id.*

## II.   Applicable Legal Standards

### A.   Relevant Legal Principles Under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") creates a body of federal substantive law

establishing and governing the duty to honor agreements to arbitrate disputes.  *Mitsubishi Motors*

*Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone*

*Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).  The FAA was enacted to reverse

"centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements

'upon the same footing as other contracts.'"  *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 510–11

(1974) (citation omitted).

The Act accordingly provides that an arbitration agreement "shall be valid, irrevocable,

and enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract." 9 U.S.C. § 2.  The Act is based on Congress's powers to regulate interstate commerce and admiralty.  It applies to "any maritime transaction or a contract evidencing a transaction involving commerce," *id.*; *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 405 (1967).

      Notwithstanding the strong "national policy favoring arbitration" evinced by Congress's enactment of the FAA, *see Southland*, 465 U.S. at 10,  "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (citations omitted).  Therefore, the FAA's presumption of arbitrability does not apply to the threshold issue of whether the parties entered into a binding agreement to arbitrate at all.  *See Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("[T]he presumption does not apply to disputes concerning whether an agreement to arbitrate has been made."); *Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72 (2d Cir. 1997).  As a general matter, "[w]hen deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010); *Applied Energetics*, 645 F.3d at 526.

      In deciding whether an action should be directed to arbitration, this Court must determine: (i) whether the parties had an agreement to arbitrate; (ii) the scope of that agreement; (iii) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (iv) if some, but not all, of the claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration.  *See JLM Industries, Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 169 (2d Cir. 2004); *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76

(2d Cir. 1998).  "[D]oubts concerning the scope of an arbitration clause should be resolved in favor of arbitration."  *Applied Energetics*, 645 F.3d at 526.

## B.       FINRA Membership and Its Arbitration Rules

Established under Section 15A of the Securities Exchange Act of 1934, FINRA[3] is a self-regulatory organization with the authority to "exercise comprehensive oversight over 'all securities firms that do business with the public.'"  *UBS Fin. Servs., Inc. v. W. Vir. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (citing *Sacks v. SEC*, 648 F.3d 945, 948 (9th Cir. 2011)).  Membership in FINRA "constitutes an agreement to 'adhere to FINRA's rules and regulations, including its Code and relevant arbitration provisions contained therein.'"  *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011) (citing *UBS Fin. Servs.*, 660 F.3d at 649); *see also Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 171 (2d Cir. 2011) (The "interpretation of arbitration rules of an industry self-regulatory organization . . . such as FINRA is similar to contract interpretation.").

FINRA's Code of Arbitration Procedure ("Code") provides that "[e]xcept as otherwise provided in the Code, a dispute must be arbitrated under the Code if the dispute arises out of the business activities of a member or an associated person and is between or among" members, members and associated persons, or associated persons.  Code § 13200.  Section 13100(o) of the Code defines a "member" to include "any broker or dealer admitted to membership in a self-regulatory organization that, with FINRA consent, has required its members to arbitrate pursuant to the Code and/or to be treated as members of FINRA for purposes of the Code, whether or not the membership has been terminated or cancelled."  The Code defines "associated person" of a member as:

---

[3] FINRA is the successor to the National Association of Securities Dealers, Inc. ("NASD").

(1)     [a] natural person who is registered or has applied for registration under the Rules of FINRA; or

(2)     [a] sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA.

For purposes of the Code, a person formerly associated with a member is a person associated with a member.

Code § 13100(r).

## III.    Discussion

Defendants move to compel arbitration on the grounds that Christensen's claims are exclusively arbitrable before FINRA.  They argue that Christensen must arbitrate these claims because, by registering with FINRA, he agreed to submit all disputes "aris[ing] out of the business activities'" between Christensen and the firm or any other person to arbitration.  Def. Br. 4.  (quoting Code § 13200).

It is undisputed that KCCI was a member of FINRA, Compl. ¶ 2; Def. Br. 3, and that Christensen, Nauman, and Gollner, as directors and/or officers of KCCI at all times relevant to this case, were associated persons.  Thus, the parties are bound by the FINRA arbitration rules, and are bound to arbitrate, if the dispute "arises in connection with" KCCI's business activities.[4]

---

[4] That KCCI terminated its FINRA registration on December 31, 2013 does not prevent it from pursuing FINRA arbitration.  KCCI (and its associated persons) are "subject to the FINRA arbitration requirement as long as its membership ha[d] not been terminated or cancelled prior to the material events giving rise to the dispute."  *Metro. Life Ins. Co. v. Puzzo*, No. 13 Civ. 3858 (TWT), 2014 WL 1817636, at *2 (N.D. Ga. May 6, 2014); *see also Biremis, Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 11 Civ. 4934 (LDW), 2012 WL 760564, at *2 (E.D.N.Y. Mar. 8, 2012) (binding former FINRA member to FINRA arbitration); Code § 13100(o) (defining member to include "any broker or dealer admitted to membership in FINRA, whether or not the membership has been terminated or cancelled").

In opposing arbitration, Christensen makes two arguments.  First, he argues, because his allegations relate to KCCI's internal corporate governance, they fall outside of KCCI's "business activities."  Second, he argues, because he casts some claims as shareholder derivative claims, the motion to compel arbitration should be denied.  The Court addresses each argument in turn.

### A.        "Business Activities" Scope of FINRA

To determine whether Christensen's claims arise out of "business activities," it is necessary to "focus on the factual allegations in the complaint rather than the legal causes of action asserted."  *Genesco, Inc. v. T. Kakiuchi & Co., Ltd.*, 815 F.2d 840, 846 (2d Cir. 1987) ("If the allegations underlying the claims 'touch matters' covered by the parties' sales agreements, then those claims must be arbitrated, whatever the legal labels attached to them."); *see also Mitsubishi*, 473 U.S. at 622 n.9, 624 n.13.  Further, the Court reviews the Complaint's factual allegations mindful of the "strong federal policy favoring arbitration" and of its duty to "'construe arbitration clauses as broadly as possible.'"  *Oldroyd*, 134 F.3d at 76 (quoting *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995)); *see also John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001) ("[A]ny ambiguity in the language [of FINRA's mandatory arbitration provision] must be construed in favor of arbitration.").

The Code does not define the term "business activities."  *See* Code § 13100.  Defendants argue that because Christensen's allegations "directly implicate some of the most fundamental aspects of [his] business relationship" with the defendants, Christensen's claims arise out of KCCI's business activities.  *Hawkins v. Toussaint Capital Partners, LLC*, No. 08 Civ. 6866 (PKL), 2010 WL 2158332, at *5 (S.D.N.Y. May 27, 2010).  Christensen, for his part, acknowledges that employment-related disputes between a FINRA member and an associated

person, including disputes relating to the compensation and payment of associated persons, are "business activities" arbitrable before FINRA, Pl. Br. 9, n.4, as the case law holds.  *Murray v. UBS Sec., LLC*, No. 12 Civ. 5914 (KPF), 2014 WL 285093 (S.D.N.Y. Jan. 27, 2014); *Hawkins*, 2010 WL 2158332; *French v. Wells Fargo Advisors, LLC*, No. 11 Civ. 246, 2012 WL 479961 (D. Vt. Feb. 14, 2012).  But, Christensen argues, his claims are different because they implicate issues of internal corporate governance.  In pressing that argument, Christensen relies on *Valentine Capital Asset Management Inc. v. Agahi*, which, he argues, reveals that only "matters with some nexus to the activity actually regulated by FINRA" qualify as arising from "business activities."  174 Cal. App. 4th 606, 616 (2009).

At issue in *Valentine* were claims of libel, slander, defamation, unfair competition, and theft of trade secrets.  The *Valentine* defendants were registered representatives of FINRA members.  *Id.* at 611.  But, the California Court of Appeal held, the defendants had not undertaken the activities at issue in connection with the FINRA member with whom they were associated.  Instead, the defendants had taken the challenged acts in connection with "investment advisory firms," which were "*not* members of FINRA."  *Id.* at 618 (emphasis added).  Under the Code, the court held, "an associated person" does "not have to arbitrate claims regarding matters outside his business activities as an associated person of a FINRA member."  *Id.* at 617; *see also id.* at 618 ("None of the purported wrongdoing in either pleading [was] alleged to have occurred in the course of the parties' duties as associated persons with a FINRA-member firm.").  Thus, when an associated person engages in a "side business," the Court held, disputes arising from the side business need not be arbitrated before FINRA.  *Id.* at 616.  The Court gave as an example an associated person who engages in the "side business" of collecting and selling art.  *Id.*  Were an associated person to become embroiled in a dispute over the authenticity of a painting, even

though the dispute involved that person's business activities, the dispute would fall outside the Code's arbitration obligation because such a "private dispute" could not have been "reasonably expect[ed] . . . to be appropriate for an arbitration established as part of the regulation of stock brokerage firms." *Id.; see also id.* at 615 (identifying, as other "side business" examples, work as a freelance photographer, coin collector, and novelist).

*Valentine* is inapposite here. There is no allegation that Christensen engaged in a "side business." His relationship with defendants instead exclusively involved a FINRA-registered business. And his dispute with defendants exclusively involved the management, or alleged mismanagement, of that business—specifically, defendants' alleged failure to distribute profits or sales proceeds of that business, KCCI, to Christensen, or to respect his rights as a director. These activities involve "a nexus between the alleged wrongdoing and the actions of a party as a member or associated person." *Id.* at 623; *see also Johnson v. Charles Schwab & Co.*, No. 09 Civ. 81479, 2010 WL 678126, at *4 (S.D. Fla. Feb. 25, 2010) (where parties' only relationship is governed by FINRA, defendant's decision to send the plaintiff a cease and desist letter was a "business decision arising out of that relationship" and thus subject to FINRA arbitration). It is only because of Christensen's business relationship with KCCI and its fellow owners—the individual defendants he sues—that he has an internal corporate governance claim to pursue.

In arguing that the SEC has carved out of the scope of mandatory FINRA arbitration all disputes relating to corporate governance, Christensen also relies on a January 24, 2007 SEC Order, applicable to NASD, FINRA's predecessor organization. Pl. Br. 13. It states that

> [t]he current Code does not specifically address whether *shareholder derivative actions* may be arbitrated at NASD. NASD has stated that such claims are not eligible for arbitration in its forum because, by definition, they involve *corporate governance disputes* that do not arise out of, or in connection with, the business of a member firm or an associated person. . . . Proposed Rules 12205 and 13205 of

12

> the Customer Code and Industry Code, respectively, would provide that shareholder derivative actions are not eligible for arbitration at NASD.

NASD Release No. 34-55158, § V(C) (Jan. 24, 2007), *available at* 72 Fed. Reg. 4574, 4602. (emphasis added).

The SEC Order does not, however, sweep nearly as broadly as Christensen suggests. It instead reflects and applies a single, explicit exclusion under the Code—§ 13205, which excludes shareholder *derivative* actions from the scope of mandatory arbitration.[5] This exclusion, by its terms, does not extend to *direct* claims, whether or not such claims implicate considerations of corporate governance. And, as the Second Circuit has held, "any ambiguity in the language [of FINRA's mandatory arbitration provision] must be construed in favor of arbitration." *John Hancock*, 254 F.3d at 58. Christensen's argument in opposition to compulsory arbitration prevails only insofar as he has pled derivative claims. As to these, as defendants acknowledge, arbitration may not be compelled.

The Court therefore rejects Christensen's argument that the claims in his Complaint fall outside the "business activities" of the FINRA member, KCCI, and are therefore exempt from arbitration.

### B.    Shareholder Derivative Claims

Under Code § 13205, "[s]hareholder derivative actions may not be arbitrated under the Code." *See Butterworth v. Morgan Keegan & Co.*, No. 12 Civ. 00337, 2012 WL 4732886, at *6 (N.D. Ala. Sept. 28, 2012). Read on its face, Christensen's lawsuit contains both direct and

---

[5] The Code similarly expressly excludes statutory employment discrimination claims, Code § 13201, and class action claims, Code § 13204.

13

derivative claims.  Of the 10 remaining claims in the Complaint, three are pled as direct claims, three are pled as derivative claims, and four are pled as composites.[6]  Pl. Br. 10.

The direct claims allege injury to Christensen personally, in the form, *inter alia*, of the non-payment to him of money to which he was entitled from KCCI, including his share of the proceeds from the sale of KCCI to Lampert, and the infringement of his various rights as a director.  The derivative allegations claim injury to KCCI, in the form, *inter alia*, of Nauman and Gollner's looting of the company.

As defendants note, certain events that Christensen has cast as causing direct injury to Christensen can also be cast (and in the Complaint are cast) alternatively as causing derivative injury to KCCI.  Def. Reply Br. 13.  For example, in claiming that Nauman and Gollner kept the proceeds of the sale of KCCI entirely for themselves, Christensen alternatively depicts this event as injuring KCCI (on the premise that the sales proceeds were routed to Nauman and Gollner without ever entering KCCI's coffers, as they should have before being distributed to shareholders, including to Christensen)[7] and as injuring Christensen (on the premise that the proceeds were distributed to KCCI but that Nauman and Gollner then stole Christensen's 40%

---

[6] Of the 12 claims originally pled, two have been dismissed, because they were brought only against Lampert, whom Christensen has dismissed.  *See* Count VIII (interference with contract) and Count XII (breach of fiduciary duty).   The breach of fiduciary duty as to plaintiff (Count I), conversion as to plaintiff (Count III), and breach of contract (Count VII) claims are pled as direct claims.  The breach of fiduciary duty as to KCCI (Count II), conversion as to KCCI (Count IV), and diversion of corporate opportunity (Count V) causes of action are pled as derivative claims on behalf of KCCI.  The fraud (Count VI), unjust enrichment (Count IX), violation of Section 720 of the Business Corporation Law (Count X), and declaratory judgment (Count XI) causes of action assert, or appear to assert, both direct and derivative claims.  Pl. Br. 10.

[7] This claim is derivative in nature, because KCCI "'suffered the alleged harm . . . and . . . would receive the benefit of any recovery or other remedy.'"  *Serino v. Lipper*, No. 12722, 2014 WL 4810316, at *3 (N.Y. App. Div. Sept. 30, 2014) (citing *Yudell v. Gilbert*, 99 A.D.3d 108, 114 (N.Y. App. Div. 2012)); Tr. 19.

share for themselves).[8]  At argument, Christensen's counsel candidly acknowledged that the Complaint pleads parallel direct and derivative claims as to the same circumstances because, without discovery, Christensen cannot know the underlying facts (including the specific path that the funds paid by Lampert later took).  Tr. 18, 28, 34

The issue, then, is how the Court should proceed given that Christensen has, by his own account, pled direct as well as derivative claims.  The Court's judgment is that this matter should proceed in the first instance to arbitration, with the direction to the arbitration panel to resolve only those claims that, following development of a factual record, it finds direct in nature, and not to resolve those it finds derivative and therefore outside the scope of Christensen's arbitration obligation under his Form U-4.  The Court so holds for three reasons.

First, the Complaint pleads some claims that undisputedly are direct.  Under the Code, these direct claims (and any other(s) determined to be direct) must be resolved in arbitration.

Second, as to circumstances (*e.g.*, Nauman and Gollner's alleged theft of the Lampert proceeds) to which it is unclear whether Christensen's claims are more properly pled as direct or derivative, the development of a factual record in arbitration will enable the arbitral panel to make a more sophisticated judgment than the present pleadings permit as to how to classify these claims.  *See Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 5–6 (2d Cir. 2013); *Murray*, 2014 WL 285093, at *12–14.  Should any derivative claim or claims be identified by the panel, and should Christensen wish to pursue them after his direct claims are resolved in arbitration, those derivative claims would be for this Court to resolve.

---

[8] This claim is direct in nature, because Christensen's injury is "independent of any alleged injury to the corporation."  *Yudell*, 99 A.D.3d at 114 (citing *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004)); *see also NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 Civ. 5762 (PAE), 2013 WL 489020, at *6, n.6 (S.D.N.Y.  Feb. 8, 2013).

Third, as is well recognized, a paramount goal of parties who agree to arbitration is to provide a streamlined, efficient approach to dispute resolution. *See Folkways Music Publishers, Inc. v. Weiss*, 989 F.2d 108, 111 (2d Cir. 1993) (emphasizing the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation"); *Fairchild Corp. v. Alcoa, Inc.*, 510 F. Supp. 2d 280, 285 (S.D.N.Y. 2007) (noting "the presumed efficiency values of expeditiousness, economy and simplicity . . . in arbitration proceedings"); *Brandt v. Brown & Co. Sec. Corp.*, No. 94 Civ. 6640 (JSM), 1995 WL 334381, at *5 (S.D.N.Y. June 5, 1995) *aff'd sub nom. Brandt v. Brown & Co. Sec. Corp.*, 100 F.3d 942 (2d Cir. 1996) (stating that "speed and efficiency . . . are the goals of arbitration").  The parties here agreed to arbitrate their direct claims involving KCCI.  It would disserve that agreement, and the "strong federal policy in favor of arbitration," *Oldroyd*, 134 F.3d at 76, for Christensen's potentially derivative claims to be litigated (and subject to federal court discovery) at the same time that his direct claims (resolution of which may well resolve the parties' core disputes) are resolved in arbitration.

The Court, therefore, grants defendants' motion to compel arbitration of those claims of Christensen's, which, pursuant to New York law,[9] are determined to be direct in nature.  As to

---

[9] A federal court sitting in diversity jurisdiction, as here, applies the choice-of-law law of the forum state in which the court sits.  *Klaxon Co. v. Stento Electric Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 554 (1949) (applying choice-of-law law of the forum state in context of shareholder derivative actions).  Under New York law, courts look to the law of the state of incorporation to "adjudicat[e] a corporation's 'internal affairs,' including questions as to the relationship between the corporation's shareholders and is directors," such as a shareholder derivative action.  *Galef v. Alexander*, 615 F.2d 51, 58 (2d Cir. 1980); *see also Locals 302 & 612 of the Int'l Union of Operating Eng'rs-Employers Constr. Indus. Retirement Trust v. Blanchard*, No. 04 Civ. 5954 (LAP), 2005 WL 2063852, at *4 (S.D.N.Y. Aug. 25, 2005) (New York law applies state of incorporation law for N.Y. BCL § 626 case).  Because KCCI is a New York corporation, New York's substantive law applies.

any claims that the FINRA panel determines to be derivative, these are not to be resolved in arbitration.  The arbitral panel is to identify them as unresolved, and the Court will stand ready, after the completion of arbitration, to resolve them.

### C.     Dismissal or Stay

The FAA provides that, where the asserted claims are "referable to arbitration," a court shall "stay the trial of the action until such arbitration has been had."  9 U.S.C. § 3.  Defendants nevertheless ask this Court to dismiss, rather than stay, the case.  *See* Def. Br. 14.  Defendants are correct that "where all of the issues raised in the Complaint must be submitted to arbitration, the Court may dismiss an action rather than stay proceedings."  *Arrigo v. Blue Fish Commodities*, 704 F. Supp. 2d 299, 305 (S.D.N.Y. 2010) *aff'd* 408 F. App'x 480 (2d Cir. 2011) (citation and alteration omitted); *see also Salim Oleochemicals v. M/V Shropshire*, 278 F.3d 90, 93 (2d Cir. 2002) (Sotomayor, J.) ("We urge district courts in these circumstances to be as clear as possible about whether they truly intend to dismiss an action or mean to grant a stay."); *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 491 (S.D.N.Y. 2008)

For two reasons, the Court concludes that a stay of this lawsuit, rather than its dismissal, is warranted.

First, as noted, it is not clear that all of Christensen's claims will be resolved in arbitration.  Only those determined by the arbitral panel to be direct in nature will be resolved there; any claims found to be derivative are to return to this Court.  A stay therefore will promote judicial economy, and assure a speedier return to this Court of any claims found derivative than would outright dismissal of this lawsuit.  Notably, defendants have not articulated any reason why a stay would prejudice them.  *See The Orange Chicken, L.L.C. v. Nambe Mills, Inc.*, No. 00 Civ. 4730 (AGS), 2000 WL 1858556, at *9 (S.D.N.Y. Dec. 19, 2000) (stay appropriate where it

will "promote judicial economy, avoidance of confusion and possible inconsistent results" without working an undue hardship or prejudice against the plaintiff) (citing *Acquaire v. Canada Dry Bottling*, 906 F. Supp. 819, 838 (E.D.N.Y. 1995)); *Gen. Media, Inc. v. Shooker*, No. 97 Civ. 510 (DAB), 1998 WL 401530, at * 11 (S.D.N.Y. Jul. 16, 1998); *Moore v. Interacciones Global, Inc.*, No. 94 Civ. 4789 (RWS), 1995 WL 33650, at *7 (S.D.N.Y. Jan. 27, 1995)).

Second, as the Second Circuit has recognized, a decision to dismiss a case as to which the Court has compelled arbitration may retard the start of arbitration, because a dismissal is an appealable order, whereas a stay is not. *See Salim Oleochemicals*, 278 F.3d at 93.  It has noted that "[u]nnecessary delay of the arbitral process through appellate review is disfavored" and has admonished district courts "to be mindful of th[e] liberal federal policy favoring arbitration agreements when deciding whether to dismiss an action or instead to grant a stay." *Id.* (citations omitted).  Courts in this District have heeded this admonition and have often chosen to stay district court proceedings, even where urged to dismiss them. *See, e.g.*, *Duraku v. Tishman Speyer Props., Inc.*, 714 F. Supp. 2d 470, 475 (S.D.N.Y. 2010); *Douce v. Origin ID TMAA 1404-236-5547*, No. 08 Civ. 483 (DLC), 2009 WL 382708, at *5 (S.D.N.Y. Feb. 17, 2009).

## CONCLUSION

For the foregoing reasons, defendants' motion to compel arbitration is granted.  The case is stayed pending the outcome of arbitration before FINRA.  The arbitration is to resolve only those of Christensen's claims, which the arbitral panel, upon its view of the claims as informed by the factual record that develops, determines are direct in nature.

The parties are directed to submit a joint status letter to the Court, advising it as to the status of arbitration proceedings, every 90 days, measured from the date of this Opinion.

The Clerk of Court is respectfully directed to terminate the motion pending at docket number 8, and to place this case on the suspense docket.

SO ORDERED.

Paul A. Engelmayer

PAUL A. ENGELMAYER
United States District Judge

Dated: December 29, 2014
       New York, New York

19